960 F.2d 1080
 15 Employee Benefits Cas. 1187
 UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, et
al., Plaintiffs, Appellees,
v.
163 PLEASANT STREET CORPORATION, et al., Defendants, Appellees,
International Twist Drill (Holdings), Limited, Defendant, Appellant.
UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, et
al., Plaintiffs, Appellants,
v.
163 PLEASANT STREET CORPORATION, et al., Defendants, Appellees.
 Nos. 91-1824, 91-1947 and 91-2001.
 United States Court of Appeals,
First Circuit.
 Argued Nov. 7, 1991.
Decided March 30, 1992.
 
 Mark D. Stern, Somerville, Mass., with whom Robin Alexander, Washington, D.C., was on brief, for plaintiffs.
 Mark D. Stern, Somerville, Mass., with whom Edward J. Dailey, Boston, Mass., was on brief, for defendant Blue Cross and Blue Shield.
 Charles L. Janes, with whom James C. Stokes, R. Scott Henderson, and Bingham, Dana & Gould, Boston, Mass., were on brief, for defendant Intern. Twist Drill (Holdings), Ltd.
 Before BREYER, Chief Judge, SELYA and CYR, Circuit Judges.
 SELYA, Circuit Judge.
 
 
 1
 These appeals call upon us to ascertain the extent of a federal court's power, in an ERISA case, to assert personal jurisdiction over a foreign corporation. To complete our task, we must also consider when, and on what terms, separate corporate identities can be disregarded, to the end that a parent corporation may be sued and held responsible for a subsidiary's employee benefit obligations. At the conclusion of our odyssey, we find that the court below lacked personal jurisdiction over the primary defendant in this case. Hence, we vacate the orders which lie at the heart of these appeals.
 
 I. BACKGROUND
 
 2
 We begin by sketching the factual background mindful that, as is often true at the preliminary injunction stage, the record is somewhat scanty. For present purposes, we credit the undisputed facts presented below and adopt the district court's findings as to controverted matters to the extent they are supported by the record and not clearly erroneous.
 
 
 3
 The plaintiffs comprise an employees' union, the United Electrical, Radio and Machine Workers of America (the Union), and certain retired or disabled employees of 163 Pleasant Street Corporation (PSC). PSC is a Delaware corporation having its principal place of business in New Bedford, Massachusetts. The individual plaintiffs include both union and nonunion employees, some of whom worked for PSC's predecessor-in-interest, Morse Tool, Inc.[1] All these employees had entered into, or were beneficiaries of, agreements under which PSC contracted to pay retirees' health-care premiums.
 
 
 4
 The chief defendant is International Twist Drill (Holdings), Ltd. (ITD), a corporation organized under the laws of Scotland and maintaining its headquarters there. In June 1987, ITD purchased all the common stock of Morse Tool, which thereafter became PSC. At the time of purchase, Morse Tool was mired in bankruptcy. Although the Commonwealth of Massachusetts, through its Economic Stabilization Trust, held 150,000 shares of Morse Tool's non-voting preferred stock in connection with a preexisting debt, ITD was the sole voting shareholder. To all intents and purposes, then, PSC became a wholly owned subsidiary of ITD.
 
 
 5
 Both before and after the acquisition, ITD maintained an active role in connection with PSC's affairs. During the period when purchase was under consideration, John Lindsay, a principal of ITD, became involved in negotiations regarding the company's collective bargaining agreement--but ITD was not itself a signatory to that pact. After the purchase had been consummated, ITD appointed PSC's directors, selecting primarily members of its own board to serve in that capacity. Lindsay acted for a period of time as PSC's president. Robert Massie, another principal of ITD, served for a different period as PSC's chief executive officer and treasurer. Throughout, ITD paid Lindsay's and Massie's salaries. Moreover, at the end of each month, James Dee, PSC's controller, telephoned Scotland to discuss the subsidiary's fiscal affairs and obtain directions on how to manage its finances. ITD provided PSC with (1) ITD's financial statements (which PSC disseminated to its suppliers in order to assuage fears about its credit); (2) funds (when necessary to ameliorate PSC's often precarious fiscal situation); and (3) certain goods and services that PSC required from time to time. All in all, ITD pumped $8,000,000, more or less, into its subsidiary.
 
 
 6
 ITD's largesse notwithstanding, PSC was unable to survive. The company halted manufacturing operations in early 1990. In a letter dated June 1, 1991, PSC informed the plaintiffs that it would cease paying their health insurance premiums and that, consequently, coverage would expire at the end of July.
 
 
 7
 Plaintiffs filed suit in the United States District Court for the District of Massachusetts, naming PSC, ITD, and the health-care insurer as defendants. The complaint alleged that the planned cessation of payments would violate Massachusetts common law, the Labor-Management Relations Act (LMRA), 29 U.S.C. §§ 141-187 (1988), and the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (1988). On July 24, 1991, the district court held a hearing and entered a temporary restraining order maintaining the insurance coverage in force. On August 13, the court denied ITD's motion to quash the complaint for want of personal jurisdiction and ordered ITD to pay the health-care premiums pendente lite, as they accrued.[2]
 
 
 8
 In granting the injunction, the district court found "that ITD ... does not have ties to Massachusetts except through [PSC] or Morse Tool." Those ties, the court said, constitute "clear and convincing evidence that ITD Holdings did play an active and direct role in [PSC's] management." Although "[t]he mere fact that a subsidiary company does business within Massachusetts does not confer jurisdiction over its nonresident parent company, even if the parent is the sole owner of the subsidiary," the ITD/PSC relationship was, in the court's view, "sufficient to establish both personal jurisdiction and liability on the part of ... ITD."
 
 
 9
 On August 15, 1991, ITD filed a notice of appeal. It also sought to stay the injunction. The stay was denied, first by the district court, then by a duty panel of this court. On August 22, PSC filed for bankruptcy without paying the disputed premiums. When ITD refused to make the payments, the district court granted plaintiffs' motion to hold ITD in contempt and imposed daily fines to continue for as long as the contemnor remained obdurate. ITD sought unsuccessfully to stay the contempt order and filed a second notice of appeal.[3]
 
 II. THE DECISIONAL FRAMEWORK
 
 10
 Although the defendant's notices of appeal target the district court's preliminary injunction and contempt decree, respectively, both of those orders were premised on the district court's finding that ITD was subject to personal jurisdiction in Massachusetts--a finding that ITD has consistently disputed. Our initial investigation proceeds along those lines. After all, an absence of jurisdictional authority would render both orders void. See Kulko v. Superior Court, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978) ("It has long been the rule that a valid judgment ... may be entered only by a court having jurisdiction over the person of the defendant."); see also Willy v. Coastal Corp., --- U.S. ----, 112 S.Ct. 1076, 1081, 117 L.Ed.2d 280 (1992) ("Given that civil contempt is designed to coerce compliance with the court's decree, it is logical that the [contempt] order itself should fall with a showing that the court was without authority to enter the [underlying] decree.").
 
 
 11
 The parties have focused singlemindedly on the strength of PSC's corporate veil as the linchpin of the jurisdictional inquiry. We deem it advisable to take a step backward. While we are cognizant that a certain symbiosis exists between the jurisdictional inquiry and the corporate inquiry, the inquiries are separate and unequivalent. We think it best, therefore, to begin by scrutinizing ITD's amenability to suit in Massachusetts without reference to veil piercing. Only if this query produces negative results must we proceed to the question of whether ITD can be subjected to jurisdiction by disregarding PSC's independent corporate identity.
 
 III. DIRECT PERSONAL JURISDICTION
 
 12
 The case at bar presents a golconda of questions concerning the assertion of personal jurisdiction over an alien corporation in a situation where subject matter jurisdiction is premised upon the existence of a federal question. See 28 U.S.C. § 1331 (1988) (grant of federal question jurisdiction); 29 U.S.C. §§ 185(c), 1132(e)(1) (establishing subject matter jurisdiction under LMRA and ERISA, respectively). We take a step-by-step approach.
 
 A.
 
 13
 Because the instant case is premised on a federal question, it is distinguishable from cases that address personal jurisdiction in the context of diversity jurisdiction, 28 U.S.C. § 1332 (1988)--a context in which the focal point is, of necessity, the Fourteenth Amendment. The distinction is of potential consequence. When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment. See Lorelei Corp. v. County of Guadalupe, 940 F.2d 717, 719 (1st Cir.1991) (per curiam); Whistler Corp. v. Solar Elecs., Inc., 684 F.Supp. 1126, 1128 (D.Mass.1988). Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question case, a federal court's power to assert personal jurisdiction is geographically expanded. In such circumstances, the Constitution requires only that the defendant have the requisite "minimum contacts" with the United States, rather than with the particular forum state (as would be required in a diversity case). See Lorelei, 940 F.2d at 719; Trans-Asiatic Oil Ltd. v. Apex Oil Co., 743 F.2d 956, 959 (1st Cir.1984).
 
 
 14
 Nevertheless, while courts in federal question cases have found "that sufficient contacts [to justify the assertion of personal jurisdiction] exist whenever the defendant is served within the sovereign territory of the United States," Lorelei, 940 F.2d at 719 (citing cases), the basis for service of process returnable to a particular court must be grounded within a federal statute or Civil Rule. See, e.g., id. at 719-20; Johnson Creative Arts, Inc. v. Wool Masters, Inc., 743 F.2d 947, 950 (1st Cir.1984). In other words, though personal jurisdiction and service of process are distinguishable, they are inextricably intertwined, since service of process constitutes the vehicle by which the court obtains jurisdiction. See Lorelei, 940 F.2d at 719 n. 1; cf. Robertson v. Railroad Labor Bd., 268 U.S. 619, 622, 45 S.Ct. 621, 622-23, 69 L.Ed. 1119 (1925) (a federal court cannot acquire personal jurisdiction over a defendant unless the defendant is properly served with process).
 
 
 15
 Civil Rule 4 constitutes the principal mechanism for service of process in the federal courts.[4] In the majority of cases, Rule 4(f) limits service of process "to the territorial limits of the state in which the court is held." Johnson, 743 F.2d at 950. But, a number of federal laws provide for either nationwide or worldwide service, see 2 James W. Moore et al, Moore's Federal Practice p 4.42[2.-1] (2d ed. 1991) (listing statutes), and Rule 4(e) authorizes extraterritorial service in such circumstances.
 
 
 16
 ERISA is a statute that contemplates extraterritorial service.[5] It provides in pertinent part:
 
 
 17
 Where an action under [ERISA] is brought in a district court of the United States ... process may be served in any other district where a defendant resides or may be found.
 
 
 18
 29 U.S.C. § 1132(e)(2). By its express terms, this provision limits extraterritorial service to a nationwide, not a worldwide, scope.[6] Accord Rodd v. Region Constr. Co., 783 F.2d 89, 91 (7th Cir.1986); Cannon v. Gardner-Martin, Etc., 699 F.Supp. 265, 266 (M.D.Fla.1988).
 
 
 19
 Hence, our analysis comes full circle. When insufficient statutory authorization for extraterritorial service exists, Rule 4(e) allows such service "only to the extent permitted by the law of the state in which the district court sits." Lorelei, 940 F.2d at 720; see also Johnson, 743 F.2d at 950. It follows that, absent a federal statute permitting service of process on ITD in Scotland, our threshold inquiry must focus on Massachusetts law concerning personal jurisdiction, notwithstanding that this is a federal question case. And, because state law is subject to Fourteenth Amendment limitations, the minimum contacts doctrine, while imposing no direct state-by-state constraint on a federal court in a federal question case, acts indirectly as a governing mechanism for the exercise of personal jurisdiction. See Lorelei, 940 F.2d at 720.
 
 B.
 
 20
 In Massachusetts, a court may exercise personal jurisdiction over a foreign defendant if such jurisdiction is authorized by state statute or rule and its exercise does not offend due process. See Ealing Corp. v. Harrods Ltd., 790 F.2d 978, 981 (1st Cir.1986); Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 931 (1st Cir.1985); Carlson Corp. v. Univ. of Vt., 380 Mass. 102, 402 N.E.2d 483, 485 (1980).
 
 
 21
 On the first prong of the furcula, the "soliciting business" statute, Mass.Gen.L. ch. 223, § 38 (1990), often employed as a basis for jurisdiction in commercial cases, is inhospitable to the plaintiffs' cause. Section 38 requires that a defendant's business presence in Massachusetts be substantial or have a significant impact upon the transaction that forms the basis for the cause of action. See Mas Marques v. Digital Equip. Corp., 637 F.2d 24, 28 (1st Cir.1980). Since the district court supportably found that ITD's only ties with Massachusetts derive from the PSC connection--ITD itself does not own property, maintain bank accounts, hold a license to do business, sell goods, advertise, or solicit business in Massachusetts--the less demanding Massachusetts long-arm statute, Mass.Gen.L. ch. 223A, § 3 (1990), offers the most appropriate jurisdictional mooring for the plaintiffs' claim.[7]
 
 
 22
 Both federal and state courts have regularly construed the "transacting any business" language of the statute in a generous manner. See, e.g., Hahn v. Vermont Law School, 698 F.2d 48, 50 (1st Cir.1983); Nova Biomedical Corp. v. Moller, 629 F.2d 190, 193 (1st Cir.1980); Heins v. Wilhelm Loh Wetzlar Optical Mach. GmbH & Co., 26 Mass.App.Ct. 14, 522 N.E.2d 989, 991 rev. denied, 402 Mass. 1105, 525 N.E.2d 678 (1988). The defendant need not have a physical presence in Massachusetts. See Bond, 764 F.2d at 933. The test focuses instead upon whether the defendant attempted to participate in the commonwealth's economic life. See Hahn, 698 F.2d at 52; Nova, 629 F.2d at 195. Since the "extent of a nonresident's involvement ... is properly relevant to the constitutional, not the statutory[,] dimension of the jurisdiction inquiry," Bond, 764 F.2d at 932, even somewhat exiguous acts on a defendant's part can, at times, suffice to satisfy the long-arm statute's threshold for transacting business. See, e.g., id. at 933 (mailing four letters into Massachusetts "evidencing a single guaranty of payment for goods sold"); Hahn, 698 F.2d at 51 (mailing application information and acceptance letter to plaintiff in Massachusetts); Nova, 629 F.2d at 195, 197 (mailing two letters, which charged patent infringement and threatened litigation, into Massachusetts); Carlson, 402 N.E.2d at 485 (signing a contract in Massachusetts). Nonetheless, the mere ownership of a subsidiary by a passive investor, standing alone, has been held insufficient to satisfy the statutory requirement. See Kleinerman v. Morse, 26 Mass.App.Ct. 819, 533 N.E.2d 221, 224 (1989).
 
 
 23
 We do not believe that Kleinerman is dispositive here. In this case, plaintiffs alleged, and arguably proved, more than passive investment: ITD's agent was enmeshed in the negotiations for a collective bargaining agreement between PSC and the Union; ITD paid the salaries for top executives of PSC; ITD communicated with PSC regarding management of the business; ITD allowed financial statements to be used to shore up PSC's credit rating; and ITD made advances to PSC, in cash and in kind. In light of the expansive interpretation accorded to Mass.Gen.L. ch. 223A, § 3, we think the lower court's ruling that ITD was "transacting business" in Massachusetts is likely sustainable.
 
 
 24
 We can reserve definitive judgment on this point, however, because the long-arm statute also demands that plaintiffs' cause of action arise from the defendant's transaction of business in the commonwealth. See Marino v. Hyatt Corp., 793 F.2d 427, 428 (1st Cir.1986); Hahn, 698 F.2d at 51; Singer v. Piaggio & C., 420 F.2d 679, 681 (1st Cir.1970). The statute's relatedness requirement mirrors a key constitutional requirement for the exercise of specific jurisdiction. See Ealing, 790 F.2d at 983 ("Explicit in the [Massachusetts] long-arm statute is the specific-jurisdiction requirement that the cause of action arise from the defendant's activity within the state."). It behooves us, therefore, to truncate our statutory analysis and enter the constitutional copse.
 
 C.
 
 25
 In Donatelli v. National Hockey League, 893 F.2d 459, 462-65 (1st Cir.1990), we explicated the general policies and concerns animating the jurisprudence of personal jurisdiction. Rather than fully repastinating that ground, we concentrate here on the constitutional touchstone for personal jurisdiction: minimum contacts.
 
 
 26
 The minimum contacts standard requires that a court asserting personal jurisdiction determine that the nonresident defendant possesses sufficient contacts with the forum state so that subjecting him, her, or it to the forum's jurisdiction does not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citation omitted). The test is far from precise: "the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." Id. at 319, 66 S.Ct. at 159. Each case requires an individualized weighing of the material facts. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 485-86, 105 S.Ct. 2174, 2189, 85 L.Ed.2d 528 (1985); Kulko, 436 U.S. at 92, 98 S.Ct. at 1697. In constructing such a weighbeam, the measuring points will rarely be written in gleaming black or glistening white. "The greys are dominant and even among them the shades are innumerable." Estin v. Estin, 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561 (1948).
 
 
 27
 In analyzing a defendant's contacts, the decisionmaker's attention must be focused on "the relationship among the defendant, the forum, and the litigation." Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977). To this end, the concept of "purposeful availment" comes into play:
 
 
 28
 The application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.
 
 
 29
 Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958); see also Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (purposeful availment requirement assures that jurisdiction will not be based solely upon a defendant's "random, isolated, or fortuitous" contacts with the forum state).
 
 
 30
 The Court has also introduced concepts of reasonableness and foreseeability into minimum contacts analysis, demanding that a defendant's "conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). This means that, even where purposefully generated contacts exist, courts must consider a panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal. See Donatelli, 893 F.2d at 464-65. The Court has identified five relevant criteria: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. Burger King, 471 U.S. at 477, 105 S.Ct. at 2184. We have termed these five criteria the "Gestalt factors." Donatelli, 893 F.2d at 465.[8]
 
 
 31
 In analyzing minimum contacts, we have recognized two types of personal jurisdiction: general and specific. See, e.g., id. at 462-63. General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 & n. 9, 104 S.Ct. 1868, 1872-73 & n. 9, 80 L.Ed.2d 404 (1984). ITD's contacts are manifestly insufficient to ground a claim of general jurisdiction in the present case. The court below found that ITD's sole connection with Massachusetts concerned a single forum-based company, PSC. The transactions and communications in this respect were qualitatively less than those found non-pervasive in Helicopteros. Thus, plaintiffs' case necessarily depends upon the presence or absence of specific jurisdiction.
 
 D.
 
 32
 Specific personal jurisdiction may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts. See id. at 414 & n. 8, 104 S.Ct. at 1872 & n. 8; Donatelli, 893 F.2d at 462. The cases that address the question of when this phenomenon occurs tend to be fact-specific. See, e.g., Glater v. Eli Lilly & Co., 744 F.2d 213, 215-16 (1st Cir.1984). Overall, courts have played the tortoise in designing an analytic framework aimed at constructing a reasoned answer to this conundrum.[9]
 
 
 33
 For our part, we have formulated a few, rather abecedarian precepts pertaining to the relatedness requirement. First, we steadfastly reject the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect. See Donatelli, 893 F.2d at 463. Instead, the defendant's in-state conduct must form an "important, or [at least] material, element of proof" in the plaintiff's case. Marino, 793 F.2d at 430 (construing Massachusetts statute). Thus, in a contract case, the defendant's forum-based activities must be "instrumental in the formation of the contract." Hahn, 698 F.2d at 51 (construing Massachusetts statute). We have likewise suggested an analogy between the relatedness requirement and the binary concept of causation in tort law under which both elements--cause in fact (i.e., the injury would not have occurred "but for" the defendant's forum-state activity) and legal cause (i.e., the defendant's in-state conduct gave birth to the cause of action)--must be satisfied to find causation sufficient to support specific jurisdiction. Pizarro v. Hoteles Concorde Int'l, C.A., 907 F.2d 1256, 1259 (1st Cir.1990) (construing Puerto Rico statute). In this inquiry, foreseeability is critical. See id. at 1259-60.
 
 
 34
 To summarize these principles, we today suggest a tripartite test for the ascertainment of specific jurisdiction. First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.
 
 E.
 
 35
 We turn now to the work of applying this test to the case at hand. In considering the first segment--relatedness--it is important to bear in mind the nature of plaintiffs' claim. Their cause of action centers on ITD's supposed breach of a contractual and statutory duty to pay health-care premiums. Of the forum-related contacts mentioned by the district court, only Lindsay's involvement in negotiation of the collective bargaining agreement can be thought to give rise, or relate, to this cause of action. See Hahn, 698 F.2d at 51. The breach of contract cannot conceivably be said to have arisen directly from, or been caused proximately by, ITD's remaining Massachusetts contacts--all of which related to financial and business assistance delivered after initial execution of the collective bargaining agreement. For purposes of the second and third prongs of the test, therefore, we can restrict our inquiry to Lindsay's involvement in the labor negotiations.
 
 
 36
 Before exploring whether ITD, through Lindsay's participation in the collective bargaining process, purposefully availed itself of a Massachusetts venue in any constitutionally relevant sense, we remark the obvious: the contacts of a corporation's agent can subject the corporation to personal jurisdiction. This result flows naturally from the corporate form. "Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact, it is clear that unlike an individual its 'presence' without, as well as within, the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it." International Shoe, 326 U.S. at 316, 66 S.Ct. at 158 (citation omitted). Inasmuch as ITD had not purchased PSC when Lindsay, a part-owner of ITD, first became involved in the negotiations, we can assume, at least for argument's sake, that he was acting as an agent of ITD.
 
 
 37
 The Supreme Court, when analyzing personal jurisdiction in contract cases, has taken a holistic approach, emphasizing that a contract is an "intermediate step" in a process involving "prior ... negotiations [and] future consequences." Burger King, 471 U.S. at 479, 105 S.Ct. at 2185 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 317, 63 S.Ct. 602, 605, 87 L.Ed. 777 (1943)). Starting from this coign of vantage, courts have found that participating in significant negotiations within the forum state anent important contract terms can constitute "minimum contacts" with the state for purposes of a subsequent claim asserting breach of that contract. See, e.g., Complete Concepts, Ltd. v. General Handbag Corp., 880 F.2d 382, 388-89 (11th Cir.1989) (per curiam); Williams Elec. Co. v. Honeywell, Inc., 854 F.2d 389, 392-93 (11th Cir.1988) (per curiam); Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 840 (9th Cir.1986); Data Disc Inc. v. Systems Technology Assocs., Inc., 557 F.2d 1280, 1287-88 (9th Cir.1977).
 
 
 38
 The present case, however, is at a considerable remove. Here, unlike the defendants in the cited cases, ITD was not a party to the contract. Here, unlike the cited cases, there is no indication in the record that Lindsay's involvement in the negotiations took place in the forum state or by means of communications to and from the forum.[10] The location of the negotiations is vitally important to the jurisdictional inquiry in a case like this one. If the negotiations occurred outside the forum state, their existence cannot serve to bolster the argument for the assertion of jurisdiction in the forum. See Pathe Computer Control Systems Corp. v. Kinmont Indus., Inc., 955 F.2d 94, 96 (1st Cir.1992). Here, the negotiations constitute too thin a reed to support the district court's exercise of personal jurisdiction over ITD. For aught that appears, Lindsay might have played his part by telephone calls from Scotland to the Union's national offices in Pennsylvania, or by attending meetings held in a law firm's conference room in Delaware, New York City, or some other venue. The record leaves these important facts entirely open to conjecture, speculation, and surmise.
 
 
 39
 When personal jurisdiction is contested, plaintiffs bear the burden of proving the facts upon which the existence of jurisdiction depends. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); General Contracting & Trading Co. v. Interpole, Inc., 899 F.2d 109, 115 (1st Cir.1990); Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 389 N.E.2d 76, 78 (1979). The present plaintiffs, veil piercing aside, failed to carry the devoir of persuasion. Because there is insufficient evidence in the record to find that ITD, through its own affirmative conduct, purposefully availed itself of the privilege of conducting activities in Massachusetts such that it could reasonably anticipate being haled into court there, the district court lacked direct jurisdiction over ITD based upon the latter's contacts with the commonwealth.[11]
 
 IV. VEIL PIERCING
 
 40
 Our task is not yet finished. Although ITD, in its own right, lacked sufficient minimum contacts with Massachusetts to permit the assertion of jurisdiction over its corporate person, PSC was unarguably subject to the jurisdiction of the Massachusetts courts. Hence, if PSC's contacts can be attributed to ITD, then the jurisdictional hurdle can be vaulted. The district court thought that such attribution was legally proper on the theory that PSC's corporate veil was susceptible to piercing. On this record, we are constrained to disagree.
 
 A.
 
 41
 The principle of limited liability is a pillar of corporate law. See DeBreceni v. Graf Bros. Leasing, Inc., 828 F.2d 877, 879 (1st Cir.1987), cert. denied, 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988). Mighty though it may be, however, the limited liability principle is not an immutable rule. Moreover, while it is generally true that questions of "[l]iability and jurisdiction are independent," Sher v. Johnson, 911 F.2d 1357, 1365 (9th Cir.1990), the factors that we must consider for purposes of piercing the veil separating two corporations in the liability context also inform the jurisdictional inquiry. See Donatelli, 893 F.2d at 465-66. With this brief prelude, then, we turn to the case at bar.
 
 
 42
 Ordinarily, courts respect the legal independence of a corporation and its subsidiary when determining if a court's jurisdiction over the offspring begets jurisdiction over the parent. See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 336-37, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); Pathe Computer, 955 F.2d at 96; Donatelli, 893 F.2d at 465; Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902, 905 (1st Cir.1980). But, the "presumption of corporate separateness [may] be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." Escude Cruz, 619 F.2d at 905; accord Third Nat'l Bank v. WEDGE Group Inc., 882 F.2d 1087, 1090 (6th Cir.1989), cert. denied, 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990); cf. Mangual v. General Battery Corp., 710 F.2d 15, 21 (1st Cir.1983) ("While the parent-subsidiary relationship in itself is insufficient to justify the exercise of jurisdiction, the close relationship between the two companies is a relevant factor that may be considered."). Thus, if the record contains facts that warrant disregarding PSC's corporate independence, the district court was entitled to find ITD subject to personal jurisdiction in Massachusetts on the basis of its relationship with its subsidiary. See Donatelli, 893 F.2d at 466 ("Since the essence of personal jurisdiction is to bring responsible parties before the court, a corporation which is actually responsible for its subsidiary's decision to undertake instate activities should, in all fairness, be within the state courts' jurisdictional reach.").
 
 B.
 
 43
 Under Massachusetts common law, disregarding the corporate form is permissible only in rare situations. See Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 15-16 (1st Cir.1985) (limning criteria to be evaluated in considering veil piercing under Massachusetts law); My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748, 751-52 (1968) (similar). It would, however, serve no useful purpose to explore the interstices of the state-law standard. This is, after all, a federal question case--and in federal question cases, courts are wary of allowing the corporate form to stymie legislative policies. See, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 630, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983); Bangor Punta Operations, Inc. v. Bangor & A. R.R., 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974). For this reason, a federal court, in deciding what veil-piercing test to apply, should "look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine." Town of Brookline v. Gorsuch, 667 F.2d 215, 221 (1st Cir.1981) (citations omitted).
 
 
 44
 We think that in disputes involving workers' claims to ERISA benefits, whether derived through collective bargaining under the LMRA or from individual employment contracts, a federal court should apply a federal common law standard of corporate separateness. See Lumpkin v. Envirodyne Indus., Inc., 933 F.2d 449, 460-61 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); United Steelworkers of Am. v. Connors Steel Co., 855 F.2d 1499, 1506-07 (11th Cir.1988), cert. denied, 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989); Alman v. Danin, 801 F.2d 1, 3-4 (1st Cir.1986); Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc., 736 F.2d 516, 523 (9th Cir.1984).[12]
 
 
 45
 In an ERISA case, the applicable federal standard can sometimes be less rigorous than its state common law counterparts. The rationale for encouraging a modicum of corporate disregard in ERISA cases is grounded on congressional intent. Congress enacted ERISA to protect the interests of employee benefit plan participants and their beneficiaries. See Ingersoll-Rand Co. v. McClendon, --- U.S. ----, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 108, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989); see also 29 U.S.C. § 1001 (statement of congressional findings and declaration of policy). Against this backdrop, it is logical to conclude that the corporate form must on occasion yield in cases concerning employee benefits. See, e.g., Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1220 (2d Cir.1987) ("Courts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined."); Alman, 801 F.2d at 3 (ERISA "cannot be said to attach great weight to corporate form"); cf. Connors Steel, 855 F.2d at 1505-07 (applying similar reasoning to cases brought under LMRA). A contrary rule, giving fully as much tensile strength to the corporate shield in ERISA litigation as is bestowed by state common law, would permit "the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans." Alman, 801 F.2d at 4. Moreover, sanctioning conduct of this type would put the courts at cross purposes with Congress and thwart Congress's discernible intent. See Lumpkin, 933 F.2d at 461 ("[T]he congressional intent of ERISA is to hold employers responsible for pension benefits, so that when the corporate form poses a bar to liability, 'concerns for corporate separateness are secondary to what we view as the mandate of ERISA.' ") (quoting Pension Benefit Guar. Corp. v. Ouimet Corp., 711 F.2d 1085, 1093 (1st Cir.), cert. denied, 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983)).
 
 C.
 
 46
 Adopting a federal veil-piercing standard for ERISA cases is not tantamount to saying that separate corporate identities can be overlooked at will or at whim. The federal standard still demands a substantial showing. In determining when it may be appropriate to disregard corporate separateness in an ERISA-related dispute, a court using the federal standard should consider (1) whether the parent and the subsidiary ignored the independence of their separate operations, (2) whether some fraudulent intent existed on the principals' part, and (3) whether a substantial injustice would be visited on the proponents of veil piercing should the court validate the corporate shield. See Alman, 801 F.2d at 4; United Paperworkers Int'l Union v. Penntech Papers, Inc., 439 F.Supp. 610, 617-21 (D.Me.1977), aff'd sub nom. United Paperworkers Int'l Union v. T.P. Property Corp., 583 F.2d 33 (1st Cir.1978). Several of our sister circuits have adopted substantially similar tests. See Lumpkin, 933 F.2d at 461; Connors Steel, 855 F.2d at 1507; Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan v. Hroch, 757 F.2d 184, 190 (8th Cir.1985); Uriarte, 736 F.2d at 524. In sum, litigants who insist that the corporate veil be brushed aside must first prove three things: lack of corporate independence, fraudulent intent, and manifest injustice.
 
 D.
 
 47
 The plaintiffs' effort to justify jurisdiction over ITD, en route to establishing ITD's liability for health-care premiums, founders on the middle ("fraudulent intent") component.[13] In addressing this component, it is important to bear in mind that corporations which simply try to limit their overall liability by establishing, or acquiring, separately incorporated subsidiaries do not thereby transgress legal or ethical norms. In our commercially sophisticated society, limited liability is often a paramount consideration in the decision to maintain corporate separateness, and properly so. See, e.g., Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944) ("Limited liability is the rule, not the exception."). It is only when the quest to limit corporate responsibility evolves into a specific effort to evade a parent corporation's legal obligations that the possibility of veil piercing begins to loom. See N.L.R.B. v. Fullerton Transfer & Storage Ltd., 910 F.2d 331, 338 (6th Cir.1990). A more free-wheeling approach to veil piercing would hamstring established businesses in their legitimate efforts to expand into new fields; undermine the predictability of corporate risk-taking; and provide a huge disincentive for the investment of venture capital. Not surprisingly, therefore, the cases that permit veil piercing in the ERISA milieu all emphasize that a finding of some fraudulent intent is a sine qua non to the remedy's availability.
 
 
 48
 To be sure, the word "fraud" has a protean quality. It connotes different things in different settings. In the ERISA veil-piercing sense, "fraud" may inhere even short of the reprehensible behavior necessary to prove, say, criminal fraud or independently actionable civil fraud. Then, too, the kind and quantum of fraud may be less than under some state-law veil-piercing rules. But, although the fraud threshold is lower when veil piercing is attempted in an ERISA case, the threshold is not invisible. The case law invariably requires, as a prerequisite to corporate disregard in an ERISA matter, some cognizable showing that the parent corporation maintained the subsidiary to avoid its statutory responsibilities, acted in a blameworthy manner, looted the subsidiary, or so undercapitalized the subsidiary that the latter could not reasonably have been expected to meet its obligations. See, e.g., Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc., 872 F.2d 702, 705 (6th Cir.1988) (per curiam) (allowing veil piercing because owner looted subsidiary); Lowen, 829 F.2d at 1221 (allowing veil piercing because subsidiary's capital was "wholly inadequate" and owners looted subsidiary); Alman, 801 F.2d at 4 (allowing veil piercing because owners undercapitalized subsidiary and dealt in bad faith with unions); Hroch, 757 F.2d at 191 (allowing veil piercing because owner used subsidiary "in an inequitable fashion to avoid its obligations"); see generally J.A. Bryant, Jr., Annotation, Liability of Corporation for Contracts of Subsidiary, Y38 A.L.R.3d 1102, 1135 (1971) ("something on the order of moral culpability on the part of the parent is required to warrant holding it liable for an obligation of its subsidiary").
 
 
 49
 In this case, there is a glaring shortfall in the proof. The district court made no finding, expressly or by fair implication, that PSC was either a sham or inadequately capitalized; that ITD maintained PSC's separate corporate identity as a subterfuge; that ITD intended to use PSC as a shell in order corruptly to avoid obligations owed to the Union under the collective bargaining agreement or otherwise; or that ITD had any other malevolent purpose. The court did not mention any attempts by ITD to loot its subsidiary, skirt labor law obligations, or subvert ERISA's policies by reliance on the technicalities of the corporate form. The court cited no evidence that ITD was, from the start or thereafter, playing a rogue's game.
 
 
 50
 The plaintiffs attempt to fill this void by arguing that PSC was so thinly capitalized that an ulterior motive can be inferred from the silent record. The lyrics have a soothing ring, but the tune is completely off-key. In the first place, we are inclined to view the absence of a finding to this effect as fatal, whether or not the evidence, scanty though it is, might support a permissive inference such as the plaintiffs describe. In the second place, the evidence, howsoever recast, simply does not substantiate the inference.
 
 
 51
 Inadequate capitalization can, of course, be a badge of fraud. But, the record here does not reflect a shoestring operation. Rather, it reveals an investor spending freely in what has all the earmarks of a good-faith, if ultimately unsuccessful, endeavor to resurrect a moribund company. As the plaintiffs admit, in the thirty months during which PSC endured, ITD injected roughly $8,000,000, partly in cash and partly in kind, in a fruitless effort to revivify PSC's manufacturing operations. To draw an inference of fraudulent intent from so forthcoming a history defies logic. Cf. Uriarte, 736 F.2d at 525 (distinguishing the propriety of veil piercing in a case where a subsidiary was undercapitalized from a case where a subsidiary "was once adequately capitalized but subsequently fell upon bad financial times").
 
 
 52
 We have previously examined this very issue in a case, not cited by any party, which possesses uncanny similarities to the case at bar. In United Paperworkers Int'l Union v. Penntech Papers, Inc., 439 F.Supp. 610 (D.Me.1977), aff'd sub nom. United Paperworkers Int'l Union v. T.P. Property Corp., 583 F.2d 33 (1st Cir.1978), a paper mill, operated by Kennebec Corporation, had a collective bargaining agreement with the Paperworkers Union. The mill was shut down by its parent company because the operation proved unprofitable. Later on, Penntech, an unrelated company, exhibited an interest in buying Kennebec. Kennebec and the union bargained in anticipation of the acquisition. Penntech, which had not yet acquired the mill, made suggestions on how to structure the collective bargaining agreement. These suggestions were incorporated into the final version of the pact. During the same period, Penntech also negotiated with Kennebec's creditors in a successful attempt to write down some of Kennebec's outstanding debt.
 
 
 53
 Two days after Kennebec and the union signed the collective bargaining agreement, the sale was consummated. Penntech became the sole owner of Kennebec (which retained its separate corporate identity). The mill operated under Penntech's stewardship for approximately one year. The ties between parent and subsidiary were close. Penntech staffed Kennebec's board with individuals who were associated with Penntech; elected several insiders as officers; and loaned Kennebec over $100,000 to get the mill back on its feet. Nevertheless, Kennebec's losses mounted. After a year, the mill folded.
 
 
 54
 Basing its claims on the LMRA, the union then attempted to hold Penntech, a non-signatory, to the terms of the collective bargaining agreement. The district court rejected the union's attempt to subject Penntech to Kennebec's labor agreement. We affirmed. Like the district court, we refused to disregard the corporate form absent evidence of Penntech's fraudulent intent in acquiring and maintaining Kennebec. See T.P. Property, 583 F.2d at 35-36; Penntech, 439 F.Supp. at 617-21. This fraud requirement:
 
 
 55
 holds true even when the subsidiary is found to be an alter ego or instrumentality of the parent. It is particularly so in contract cases because contracts are private, consensual relationships in which each party has a clear and equal obligation to weigh the potential benefits and risks of the agreement. Unless fraud or misrepresentation is involved, there can be little justification for disregarding corporate entities which the parties obviously expected to remain intact.
 
 
 56
 Penntech, 439 F.Supp. at 618.
 
 
 57
 The striking factual and legal similarities between the United Paperworkers cases and the present case solidify our belief that the district court erred in concluding that PSC's corporate veil could be pierced.[14] Veil piercing cannot occur without some degree of moral culpability on the parent corporation's part. See American Bell Inc. v. Federation of Tel. Workers, 736 F.2d 879, 887 (3d Cir.1984) ("[T]here is no policy of federal labor law, either legislative or judge-made, that a parent corporation is bound by its subsidiary's labor contracts simply because it controls the subsidiary's stock and participates in the subsidiary's management.") (citing T.P. Property ). Without a finding of fraudulent intent--indeed, without the slightest evidentiary basis for such a finding--ITD could not be subjected to jurisdiction because of its relationship to PSC.
 
 E.
 
 58
 The plaintiffs try to escape from the consequences of their failure to show some vestige of fraudulent intent by reliance on a somewhat different aspect of the Massachusetts "alter ego" doctrine. This doctrine allows corporate disregard, even absent a finding of fraud, if "there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner in which the various corporations and their respective representatives are acting." My Bread, 233 N.E.2d at 752. Accordingly, when a parent and its subsidiary fail "to make clear which corporation is taking action in a particular situation," or neglect to honor "the formal barriers between the corporations with a proper segregation of their separate businesses, records, and finances," their separate entities may occasionally be disregarded "in order to prevent gross inequity." Id. (citation omitted).
 
 
 59
 This effort fails for two reasons. First, as we have previously explained, state law does not govern here. Rather, the federal courts have developed, and must perforce use, their own federal common law standard for determining corporate independence in cases involving ERISA plans. See, e.g., Lumpkin, 933 F.2d at 460-61; Connors Steel, 855 F.2d at 1506-07; Alman, 801 F.2d at 3-4; Uriarte, 736 F.2d at 523; T.P. Property, 583 F.2d at 35-36. We are aware of no case applying the federal standard which permits the piercing of a corporate veil on a showing of something less than fraud (as we have defined it, see supra pp. 1093-94).
 
 
 60
 Second, if we were to assume arguendo that, under federal common law, a doctrine roughly congruent to the Massachusetts alter ego doctrine (or even a slightly milder varietal thereof) might be recognized as a basis for veil piercing in an appropriate ERISA case, cf., e.g., cases cited supra note 12, the present plaintiffs still could not prevail. Successful invocation of the alter ego doctrine requires a showing that businesses, although separately incorporated, have been operated in so imbricated a manner as to justify a reasonable perception that they were one and the same. See Westcott Constr. Corp. v. Cumberland Constr. Co., 3 Mass.App. 294, 328 N.E.2d 522, 525-26 (1975). There is no such evidence in this record. Similarly, there is no suggestion here that ITD manipulated its interest in PSC in such a way as to "blur the practical distinctions" between the two corporate entities. Oman Int'l Fin. Ltd. v. Hoiyong Gems Corp., 616 F.Supp. 351, 364 (D.R.I.1985). PSC alone signed the collective bargaining agreement and the individual labor contracts; executing the pacts in this manner "ma[de] clear which corporation [was] taking action" with respect to the promise to pay health-case premiums. My Bread, 233 N.E.2d at 752. In short, the evidence does not begin to approach the level of "confused intermingling" or "serious ambiguity" needed to support a finding that PSC and ITD had become alter egos. Compare, e.g., WJM, Inc. v. Massachusetts Dep't of Pub. Welfare, 840 F.2d 996, 1009-10 (1st Cir.1988) (respecting corporate separateness); Miller v. Honda Motor Co., 779 F.2d 769, 772-73 (1st Cir.1985) (same); Evans v. Multicon Constr. Corp., 30 Mass.App.Ct. 728, 574 N.E.2d 395, 398-400 (same), rev. denied, 410 Mass. 1104, 577 N.E.2d 309 (1991); and Westcott, 328 N.E.2d at 526 (same) with Pepsi-Cola, 754 F.2d at 14-15 (disregarding corporate separateness).
 
 F.
 
 61
 In a final, apopemptic effort to salvage their victory below, plaintiffs contend that, even if the lower court erred in piercing the corporate veil, jurisdiction over ITD was nonetheless exercisable under an "integrated enterprise" theory. Whatever the cogency of this asseveration--and we are highly skeptical of its merits in light of the conspicuous lack of support in the case law for transplanting this theory from the liability context to the jurisdictional context--the plaintiffs have forfeited the opportunity to seek appellate review of this contention.
 
 
 62
 It is frequently true that legal theories not squarely presented in the nisi prius court are deemed waived on appeal. See, e.g., McCoy v. Massachusetts Inst. of Technology, 950 F.2d 13, 22 (1st Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992); Clauson v. Smith, 823 F.2d 660, 666 (1st Cir.1987). Square presentation implies timely presentation. In this instance, plaintiffs did not raise the argument distinctly or in a timely fashion in the court below. This deficiency is fatal even though plaintiffs appear here as appellees for, although an appellate court has the power to affirm a judgment on any independently sufficient ground documented by the record, whether or not relied on below, see, e.g., Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 (1st Cir.1987), the plaintiffs' dilatoriness in presenting the integrated enterprise point, coupled with the nonchalant nature of their allusion to it, have combined to leave the present record without a basis adequate to permit judicial evaluation of the doctrine's applicability.[15] The record simply does not contain satisfactory proof of the criteria upon which the availability of the doctrine depends. See, e.g., Radio & Television Broadcast Technicians, Etc. v. Broadcast Serv., Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam) (elucidating criteria for operation of integrated enterprise doctrine); Rivas v. Federacion de Asociaciones Pecuarias, 929 F.2d 814, 820 n. 16 (1st Cir.1991) (similar). As a result, the court below did not consider the theory. We are equally disadvantaged--more so, perhaps, because there are no pertinent findings for an appellate court to review. Hence, plaintiffs' argument suffers from a fatal insufficiency of proof.
 
 
 63
 We hasten to add that, were we willing to entertain an attempt to assert jurisdiction over ITD under this newly emergent theory, such evidence as there is suggests that the plaintiffs would not be benefitted. While ITD owned PSC, that fact, without more, is not enough to justify the invocation of the integrated enterprise doctrine. See United Tel. Workers v. N.L.R.B., 571 F.2d 665, 667 (D.C.Cir.), cert. denied, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978). And as we have pointed out in a slightly different context, see supra Part IV(E), other criteria for the application of the integrated enterprise doctrine are lacking. In sum, our examination of the record fully persuades us that there is insufficient evidence concerning the interrelationship of the corporations' management and operations to bring the integrated enterprise doctrine into play.
 
 V. MISCELLANEOUS MATTERS
 
 64
 Finding a want of in personam jurisdiction on the record as it stands, we are left with two additional matters initiated by the plaintiffs. We consider them seriatim.
 
 A.
 
 65
 The plaintiffs' cross-appeal makes but a single point. It challenges the district court's denial of the plaintiffs' request to exclude certain of ITD's affidavits. This strikes us as a non-issue, since the material in the disputed affidavits is of only tangential relevance to the matters upon which the main appeals hinge. When, as in this case, disputed affidavits amount to no more than buzznacking because, come what may, they will have no bearing upon the outcome of an appeal, a reviewing court should simply ignore them. See Sheinkopf v. Stone, 927 F.2d 1259, 1262 n. 3 (1st Cir.1991); William J. Kelly Co. v. Reconstruction Fin. Corp., 172 F.2d 865, 867-68 (1st Cir.1949). We follow this course. Hence, because nothing turns on the cross-appeal, it is pretermitted.
 
 B.
 
 66
 The other matter with which we must deal is plaintiffs' motion to dismiss ITD's appeals. In this motion, plaintiffs argue that, because ITD "has failed to obey ... the preliminary injunction and the contempt order issued by the district court," it should not be allowed to prosecute its appeals. In support, the plaintiffs advance a novel theory of disentitlement derived from the fugitive-from-justice doctrine. See generally Molinaro v. New Jersey, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (per curiam) (discussing fugitive-from-justice doctrine); United States v. Puzzanghera, 820 F.2d 25 (1st Cir.) (similar), cert. denied, 484 U.S. 900, 108 S.Ct. 237, 98 L.Ed.2d 195 (1987). We believe the plaintiffs' reliance on this doctrine is utterly misplaced.
 
 
 67
 The fugitive-from-justice doctrine is a prudential device which courts may invoke to estop fugitives from challenging criminal convictions in absentia. Puzzanghera, 820 F.2d at 27; United States v. Tremont, 438 F.2d 1202, 1203 (1st Cir.1971) (per curiam). The driving force behind the doctrine is the idea that a criminal defendant, following conviction and initiation of an appeal, should not be allowed, by absconding, to create a "heads I win, tails you lose" situation. Thus, the doctrine holds that a fugitive, having flouted the justice system, should not be permitted simultaneously to milk the system for his own benefit by seeking vacation of the very conviction that inspired his unlawful flight.
 
 
 68
 When the claim of disentitlement is addressed to a civil suit, the doctrine must be applied sparingly. Thus, "while we have previously extended the application of the doctrine beyond an appeal in a criminal case, to a civil case, it is clear that this must be a civil case closely related to the criminal matter from which the applicant is a fugitive." United States v. Pole No. 3172, Hopkinton, 852 F.2d 636, 643 (1st Cir.1988) (citation omitted); cf. United States v. Eng, 951 F.2d 461, 464 (2d Cir.1991) (the doctrine of disentitlement holds that "a person who is a fugitive from justice may not use the resources of the civil legal system while disregarding its lawful orders in a related criminal action"). In this case, the plaintiffs' argument does not get out of the starting gate: since ITD committed no crime, the fugitive-from-justice doctrine does not in any way bar its prosecution of the instant appeals.
 
 
 69
 Apparently recognizing the weakness of their position, the plaintiffs try to conjure up a new rule of law by analogy to, and extension of, the fugitive-from-justice doctrine. They argue, without a shred of supporting authority, that a civil contemnor, not having complied with the underlying decree, should be prohibited from appealing either that decree or the contempt order itself. In the circumstances of this case, we refuse to essay so heroic a leap.
 
 
 70
 Disentitlement is not a matter of jurisdictional dimension; rather, it is a concept premised on principles of equity. See United States v. Sharpe, 470 U.S. 675, 681 n. 2, 105 S.Ct. 1568, 1573 n. 2, 84 L.Ed.2d 605 (1985); United States v. Van Cauwenberghe, 934 F.2d 1048, 1054 (9th Cir.1991). ITD is not a fugitive. It has made a series of good-faith challenges, in the district court and on appeal, to an adverse jurisdictional ruling. In so doing, ITD has acted within the legal system's rules, not as an outlaw, but as a litigant determined to assert a colorable defense in a responsible way. We think that, in general, a court should be extremely reluctant to invoke the equitable doctrine of disentitlement when an appellant has not committed any criminal act.[16] Cf. Pole No. 3172, 852 F.2d at 643. No such wrongdoing can conceivably be attributed to ITD. On this record, we cannot even say that ITD stands before us with unclean hands.
 
 
 71
 We note, too, that the plaintiffs' argument flies in the teeth of the case law regarding litigants' attempts to challenge contempt orders on personal jurisdiction grounds. Because "[c]ourt orders are accorded a special status in American jurisprudence," In re Providence Journal Co., 820 F.2d 1342, 1347 (1st Cir.1986), modified, 820 F.2d 1354 (1st Cir.1987) (per curiam), cert. dismissed, 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988), parties wishing to challenge such orders must proceed within the guidelines of the collateral bar rule. This rule dictates "that court orders, even those that are later ruled unconstitutional, must be complied with until amended or vacated." Id. at 1345. As a conventional matter, then, a party wishing to appeal a district court's order should either obtain a stay of the order or comply with its terms until an appeals court amends or vacates the order. See id. at 1346.
 
 
 72
 Nevertheless, "court orders are not sacrosanct," id. at 1347, and the collateral bar rule is not without exceptions. One such exception is pertinent here. It is established beyond peradventure that a party may bring an appeal to challenge a contempt order, notwithstanding the failure to obtain a stay or comply with the order's terms, if the order was entered by a court lacking jurisdiction over the contemnor or the subject matter. See United States Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 76, 108 S.Ct. 2268, 2270, 101 L.Ed.2d 69 (1988); United States v. United Mine Workers, 330 U.S. 258, 293, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947); Providence Journal, 820 F.2d at 1347. This tenet flows naturally from the fact that jurisdictional concepts are not merely technical rules. Rather, such concepts are founded
 
 
 73
 on the central principle of a free society that courts have finite bounds of authority, some of constitutional origin, which exist to protect citizens from ... the excessive use of judicial power. The courts, no less than the political branches of government, must respect the limits of their authority.
 
 
 74
 Catholic Conference, 487 U.S. at 77, 108 S.Ct. at 2271. Were a contrary view to prevail, "a court could wield power over parties or matters obviously not within its authority--a concept inconsistent with the notion that the judiciary may exercise only those powers entrusted to it by law." Providence Journal, 820 F.2d at 1347.
 
 
 75
 To say more would be to paint the lily. We refuse to twist the fugitive-from-justice doctrine into the unfamiliar contours envisioned by the plaintiffs. We rule that a party previously found in contempt for failing to comply with a court order does not lose its right to appeal if the merits of the appeal hinge upon the trial court's want of jurisdiction. ITD is entitled to prosecute the instant appeals.
 
 VI. CONCLUSION
 
 76
 We are keenly aware of the plight of the plaintiffs--working men and women who, upon retiring, had every expectation of continued health-care coverage. It seems unfair that the plaintiffs' expectations were dashed when PSC was forced to close its doors. It is painful for us to turn the plaintiffs away without redress. But, "[w]e do what we must, for 'it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law.' " Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 487 (1st Cir.1989) (quoting United States v. Clark, 96 U.S. (6 Otto) 37, 49, 24 L.Ed. 696 (1877) (Harlan, J., dissenting) (quoting Lord Campbell)).
 
 
 77
 We need go no further. Because the plaintiffs failed to establish that the court below was entitled to exercise in personam jurisdiction over ITD, the district court's orders were coram non judice and, therefore, no more than serial nullities. It follows inexorably that ITD's motion to quash the complaint for want of personal jurisdiction should have been granted. Accordingly, the plaintiffs' motion to dismiss ITD's appeals must be denied; the appeals themselves must be sustained; the plaintiffs' cross-appeal must be rejected; and the case must be remanded to the district court with directions to vacate the preliminary injunction and contempt order previously entered, and for further proceedings not inconsistent herewith.
 
 
 78
 Reversed and remanded.
 
 
 
 [1]
 These appeals do not require us to differentiate between PSC retirees and Morse Tool retirees or to consider separately widows of former employees
 
 
 [2]
 To be precise, the preliminary injunction required that PSC pay the insurance premiums on or before August 23, 1991; and, if it failed to do so, then ITD was to make the payments
 
 
 [3]
 The plaintiffs have cross-appealed, challenging an incidental ruling. See infra Part V(A)
 
 
 [4]
 The rule states in relevant part:
 Whenever a statute of the United States ... provides for service of a summons ... upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute ... or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides ... for service of a summons ... upon a party not an inhabitant of or found within the state, ... service may ... be made under the circumstances and in the manner prescribed in the statute or rule.
 Fed.R.Civ.P. 4(e).
 All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state....
 Fed.R.Civ.P. 4(f).
 
 
 [5]
 The LMRA, on the other hand, makes no provision for either nationwide or worldwide service. See Central Operating Co. v. Utility Workers of Am., 491 F.2d 245, 249-50 (4th Cir.1974)
 
 
 [6]
 Congressional intent to limit extraterritorial service in ERISA cases to our national boundaries is, perhaps, most graphically illustrated when one views section 1132(e)(2) against the linguistic backdrop of those federal statutes providing for worldwide service of process. See, e.g., 15 U.S.C. § 22 (1988) (Clayton Act) ("[A]ll process ... may be served in the district of which [the corporate defendant] is an inhabitant, or wherever it may be found."); 15 U.S.C. § 77v (1988) (Securities Act) (similar); 15 U.S.C. § 78aa (1988) (Securities Exchange Act) (similar); 15 U.S.C. § 79y (1988) (Public Utility Holding Company Act) (similar); 15 U.S.C. § 80a-43 (1988) (Investment Company Act) (similar); 28 U.S.C. § 1608 (1988) (Foreign Sovereign Immunities Act) (similar)
 
 
 [7]
 The statute provides in relevant part:
 A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
 (a) transacting any business in this commonwealth;
 (b) contracting to supply services or things in this commonwealth[.]
 Mass.Gen.L. ch. 223A, § 3 (1990).
 
 
 [8]
 For present purposes, we think it has some significance that the Court recently assayed the Gestalt factors in considering a jurisdictional dispute involving a defendant from another nation. See Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-16, 107 S.Ct. 1026, 1032-34, 94 L.Ed.2d 92 (1987)
 
 
 [9]
 Some circuits have made strides in this direction. The Ninth Circuit has suggested that "the critical focus in the 'arising out of' prong is whether, 'but for' the defendant's forum-related activities, the injury would have occurred; that is, whether the 'entire course of events ... was an uninterrupted whole which began with, and was uniquely made possible by, the [defendant's] contacts in [the forum state].' " Alexander v. Circus Circus Enters., Inc., 939 F.2d 847, 853 (9th Cir.1991) (citation omitted). The Sixth Circuit has articulated a less rigorous standard, mandating that "the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities." Third Nat'l Bank v. WEDGE Group Inc., 882 F.2d 1087, 1091 (6th Cir.1989) (emphasis in original; citation omitted), cert. denied, 493 U.S. 1058, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990). And the Seventh Circuit has interpreted a long-arm statute's "arising from" requirement in a similar vein, ruling that if the contract which forms the basis for a suit "lies in the wake" of a defendant's forum-state contacts, causality exists. Deluxe Ice Cream Co. v. R.C.H. Tool Corp., 726 F.2d 1209, 1216 (7th Cir.1984). While these tests help to focus the causality inquiry, their predictive force is open to debate
 
 
 [10]
 On this point, the district judge simply noted that an affidavit submitted on plaintiffs' behalf "says that Lindsay was involved in all the contract negotiations with the union." This statement accurately summarizes the affidavit in question. The plaintiffs presented no other evidence regarding the manner of Lindsay's involvement, the ways in which he participated, the means he employed, or his whereabouts at the time. The record below is equally barren of any proof as to where the negotiations were conducted
 
 
 [11]
 Absent proof of the necessary minimum contacts, we need not address the question of reasonableness. The Gestalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled. Cf. Donatelli, 893 F.2d at 465
 
 
 [12]
 While the veil-piercing inquiry in an ERISA case is thus rooted in federal law, state law is not rendered completely irrelevant. See Massachusetts Laborers' Health & Welfare Fund v. Starrett Paving Corp., 845 F.2d 23, 27 (1st Cir.1988) (order denying rehearing) (federal veil-piercing standard in ERISA cases "takes its content in part from related state law"); Uriarte, 736 F.2d at 523 ("In considering whether to disregard the corporate form [in an ERISA case], we apply federal substantive law, although we may look to state law for guidance.")
 
 
 [13]
 Concluding, as we do, that the record will not support a finding of fraudulent intent, we need not address here either the first or third components
 
 
 [14]
 We recognize, of course, that the United Paperworkers cases did not deal with the special policy concerns implicated by ERISA. But, this is a distinction without a difference. As we have explained, the ERISA cases consistently require a showing of fraud as a precondition to piercing the corporate veil
 
 
 [15]
 To be sure, the plaintiffs made a fleeting reference to this theory in some papers handed to the district judge during the preliminary injunction hearing. Neither the court nor ITD, however, had time to consider or analyze the theory before the court granted the preliminary injunction. Under the circumstances, the plaintiffs' casual proffer was too little, too late. See, e.g., McCoy, 950 F.2d at 22 (court of appeals will not review claims that were "merely insinuated rather than actually articulated in the trial court"); Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 183 (1st Cir.1989) ("A litigant has the duty to spell out her theories clearly and distinctly before the nisi prius court, on pain of preclusion.")
 
 
 [16]
 It may be, in theory, that some outrageous conduct, short of transgressing the criminal law, might in some special circumstances justify a disentitlement penalty. We need not speculate as to this possibility, however, as it is clear that ITD has done nothing sufficiently culpable to warrant so draconian a sanction