United States v. Paltrow          CV-90-163-M    06/13/96

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>United States</u>,
     Plaintiff

     v.                                         Civil No. 90-163-M

<u>Robert W. Paltrow,</u>
<u>North American Communications, Inc.,</u>
<u>American Cancer Research Funds, Inc.,</u>
<u>American Heart Research Foundation, Inc.,</u>
     Defendants


<u>MEMORANDUM DECISION</u>


     The United States of America brought this equitable action
for unjust enrichment, seeking to recover the value of postage
discounts improperly used by two bogus charities.  The government
asserts that it was defrauded by defendant Robert Paltrow and the
three corporate defendants as part of a scheme to raise money
from the public, ostensibly for charitable purposes, but in fact
merely to pay defendant North American Communications, Inc.
("NAC") to print and mail solicitation materials.  The two bogus
charities, defendants American Cancer Research Funds, Inc.
("ACRF") and American Heart Research Foundation, Inc. ("AHRF"),
were defaulted for failure to appear and defend.  Fed. R. Civ. P.

55(a).  The government's claims against Paltrow and NAC were tried to the court.

The government asserts that ACRF and AHRF (collectively, the "charities") fraudulently obtained and used a reduced-rate mailing permit and were, therefore, unjustly enriched by the amount of additional postage they should have paid to mail their fund-raising materials.  As for Paltrow and NAC, the government asserts that they should each be held directly liable for the postage deficiencies because they too were involved in and unjustly enriched by the charities' fraudulent use of the postal permit.  Alternatively, the government argues that the court should pierce the charities' corporate veils and hold Paltrow liable for the charities' unjust enrichment, as their "alter ego."[1]

---

[1]  As a third theory of recovery against Paltrow, the government urges the court to: (i) find that North American Communications, Inc. was unjustly enriched by the charities' conduct; (ii) pierce its corporate veil; and (iii) hold Paltrow personally liable for the postage deficiencies as one of NAC's officers and directors.  However, the government produced no evidence which would support piercing NAC's corporate veil and, therefore, that argument requires no further discussion.  See Trial Transcript, Day 2 (document no. 44, volume 3 of 3) at 119-124.

## Procedural History[2]

In 1983, Robert Paltrow organized ACRF as a non-profit corporation under the laws of the Commonwealth of Virginia. The corporation's stated purpose was to promote research into the causes, treatments, and cures of cancer. Paltrow also organized AHRF as a non-profit corporation under the laws of the State of Maryland, ostensibly to promote research into the causes, treatments, and cures of heart disease. The Internal Revenue Service granted both ACRF and AHRF non-profit, tax-exempt status under 26 U.S.C. § 501(c)(3).

Paltrow was the president, treasurer, and executive director of ACRF and president of AHRF. He was not, however, an incorporator or director of either of the charities. Both charities are now defunct. Defendant North American Communications, Inc., is a closely-held corporation, incorporated in New York and engaged in the direct mail business. Paltrow is the president and a substantial shareholder of NAC.

---

[2] **The court's recitation of the procedural history and background of this case is taken, in substantial part, from the prior opinions in this case.** See United States of America v. American Heart Research Foundation, No. 90-372-S, slip op. (D.N.H. July 2, 1992) (Stahl, J.), aff'd in part and vacated in part, United States v. American Heart Research Foundation, Inc., 996 F.2d 7 (1st Cir. 1993).

3

In 1986, the United States Attorney's Office in New Hampshire filed a criminal information against ACRF and AHRF, alleging ten counts of mail fraud under 18 U.S.C. § 1341. The information alleged that the charities participated in a scheme to defraud the general public by soliciting contributions to fund research projects investigating the causes and prevention of cancer and heart disease, without ever intending to fund any such projects. NAC and Paltrow were named as participants in the scheme, but were not formally charged. ACRF and AHRF pled guilty to the criminal information. As part of a plea agreement with the government, the charities jointly agreed to pay a fine of $100,000. In return, the government pledged that no further criminal charges would be brought against them, or anyone associated with them, for any of the conduct that had been the subject of the grand jury's inquiry. Government's Exhibit 22.

At the same time, the United States Attorney's office filed a civil action against ACRF, AHRF, NAC, and Paltrow, seeking permanent injunctive and ancillary relief. The government alleged that ACRF and AHRF defrauded the public through the mails by posing as charities involved in funding heart and cancer research. The government also alleged that Paltrow controlled

4

the charities and that he used NAC to facilitate the fraud by printing and distributing their mass mailings. Eventually, in order to resolve that civil matter, ACRF, AHRF, NAC, and Paltrow agreed to the entry of a permanent injunction. They also agreed to contribute all proceeds of the scheme in their possession to legitimate organizations conducting research in the fields of cancer and heart disease. Government's Exhibit 24. According to Paltrow, in excess of $300,000 was actually donated to university research centers as part of the agreement. Government's Exhibit 18 at para. 11; Government's Exhibit 19 at para. 14. In the end, then, the government either recovered or directed the disbursement of all receipts which were not already expended in actual fund-raising costs.

In 1989, the government launched a third legal attack. The Department of Justice, this time on behalf of the Inspector General of the United States Postal Service, wrote to defendants NAC and Paltrow, explaining its intention to bring another civil suit against ACRF, AHRF, NAC, and Paltrow, under the False Claims Act. 31 U.S.C. § 3729. After settlement discussions failed, NAC and Paltrow filed a declaratory judgment action against the government in this court. Shortly thereafter, the government

filed suit in the District Court for the Western District of Pennsylvania against ACRF, AHRF, NAC, and Paltrow under the False Claims Act, and based on a common law theory of unjust enrichment. That action was transferred to this court and the two cases were consolidated.

In 1992, this court (Stahl, J.) granted defendants' motion for summary judgment, holding that they were entitled to judgment as a matter of law on the government's claims under the False Claims Act. Judge Stahl also determined that the government's claims based on a theory of common law unjust enrichment were barred by the doctrine of res judicata, reasoning that the government should have presented all its civil claims for relief in the earlier civil action, when it sought and obtained injunctive relief against the defendants. The Court of Appeals for the First Circuit affirmed Judge Stahl's decision with regard to the government's counts under the False Claims Act. However, it held that the doctrine of res judicata did not bar the government's common law claims for unjust enrichment and remanded the matter for further proceedings. United States v. American Heart Research Foundations, Inc., 996 F.2d 7 (1st Cir. 1993).

6

## Findings of Fact

In July, 1984, Paltrow, acting on behalf of ACRF, submitted an application to the United States Postal Service to obtain a reduced-rate mailing permit. The application represented that ACRF was a scientific non-profit corporation, dedicated to the quest to find a cure for cancer. AHRF, on the other hand, did not obtain (nor did it seek) such a mailing permit.

ACRF used its permit to mail millions of letters soliciting contributions from the general public. AHRF also used ACRF's permit to unlawfully mail solicitations of its own. NAC printed, assembled, and mailed the solicitation materials. Because they used the special mailing permit, the charities were charged approximately one-half the normal rate for bulk, third class mail. In total, ACRF and AHRF paid the Postal Service $472,071.64 less than otherwise would have been required had they not employed ACRF's mailing permit.

NAC fronted the money necessary to finance the mailings, subject to later reimbursement from the pool of contributions collected by the charities. Testimony at trial established that such a practice was not unusual in the direct mail industry,

7

particularly when newly-formed charitable organizations, which often have little start-up capital with which to fund a mass mailing, are involved.

Despite their official 501(c)(3) status, neither ACRF nor AHRF was a bona fide charity. In fact, as characterized by the Court of Appeals, they turned out to be "old-fashioned swindles." United States v. American Heart Research Foundation, Inc., 996 F.2d at 8. When Paltrow appeared before this court and, on behalf of ACRF and AHRF, pled guilty to the criminal information, the government made the following proffer:

> Your Honor, the evidence in this case is outlined in some detail in the information, a copy of which has been provided with [sic] the Court. However, the evidence would show, if we went to trial, your Honor, that the American Cancer Research Fund and the American Heart Research Fund are two tax-exempt charitable corporations under 501(c)(3) of the Internal Revenue Code. They were established respectively in 1982 and 1983 by Mr. Paltrow, ostensibly to raise money through direct mail solicitations for research into the causes and prevention of cancer and heart disease.
>
> The evidence would show, your Honor, that these charities were created by Mr. Paltrow, who owned a company called North American Communications. North American Communications is a direct mail solicitation company which owns a manufacturing plant in Pennsylvania, which manufactures, prints, and distributes direct mail solicitation packages on behalf of a variety of charitable and political fund-raising organizations.

8

The evidence would show, your Honor, that American Cancer Research Fund and American Heart Research Fund were created principally to generate profits and business for North American Communications, and that they did so, and attempted to do so by negotiating a scheme to defraud the general public. It was part of that scheme that these two corporations would be held out to the general public as established and ongoing research and grant-disbursing organizations run and controlled and directed by disinterested boards of directors. Whereas in fact, your Honor, the evidence would show that the board of directors of both of these corporations were in effect [straw] men who were employees of Mr. Robert Paltrow, and who exercised no control or direction over either of these corporations in any meaningful fashion at any time.

* * *

Finally, the evidence would show, your Honor, that, as I said, in excess of four million or close to four million letters were mailed soliciting contributions for these organizations. As a result of those solicitation letters, 1.5 million dollars, approximately, of contributions were received.[3] However, the costs incurred in connection with the mailing of those solicitation letters exceeded 1.8 million dollars. A good portion of the funds received by the charities went to pay [North American Communications for] production costs and other costs incurred in connection with the preparation and the mailings of the letters, your Honor.

---

[3] Based upon the evidence introduced at trial, it appears that the $1.5 million figure represents the donations received by ACRF. An additional sum of approximately $0.5 million was raised in response to solicitations mailed by AHRF. See Testimony of Jeanette Gunnell, Trial Transcript Day 2 (document no. 44, volume 3 of 3) at 43-44.

Government's Exhibit 20, Transcript of Hearing on Waiver of Indictment and Plea to Information (July 10, 1986) at 13-18. Paltrow, as president and authorized representative of the charities, affirmed that the government's proffer was accurate. Id. at 18. And, in all material respects, the referenced factual allegations made by the government at the plea colloquy were supported by evidence introduced at the civil trial.

It is clear that the other officers and directors of ACRF and AHRF exercised, at most, minimal control over the charities. Paltrow actually controlled the daily affairs and finances of those entities. However, the government failed to produce persuasive evidence that Paltrow was personally unjustly enriched as a result of the charities' wrongful use of the mailing permit, either directly (through the charities) or indirectly (through NAC). He did not draw a salary from the charities, and the government did not show that he misappropriated, looted, or siphoned-off funds from the charities' accounts for his own direct benefit, or co-mingled the charities' assets with his own or those of NAC. Moreover, the government failed to demonstrate that the charities' use of the mailing permit in any measurable way affected either Paltrow's salary from NAC or the value of his

10

NAC stock. Speculative indirect benefits, like minimizing NAC's corporate business losses and delaying or cushioning a decline in stock value, might be assumed to have flowed to NAC and then, in diluted form, to Paltrow to some degree (though NAC claims to have lost money on the fraud scheme), but the government did not attempt to quantify or prove such "unjust enrichment" in this case. Rather, the government's claim was that Paltrow and NAC were unjustly enriched by an amount measurable by the difference between the discounted postage actually paid and the full rate that should have been paid by the charities.

## Discussion

First, some obvious points should be made. The charities plainly engaged in fraudulent conduct; they pled guilty and were found guilty of defrauding the public, and they also defrauded the Postal Service. Paltrow personally engaged in fraudulent conduct for which he, as the officer of the charities who orchestrated their wrongful conduct, is personally liable. However, for reasons satisfactory to it, the government agreed not to indict or charge Paltrow or NAC (See Government Exhibit 22, Para. 3a), and did not pursue a civil fraud case against Paltrow or NAC in a timely fashion. Accordingly, the government

11

bargained away its opportunity to seek criminal restitution from them, and allowed the applicable statute of limitations to intervene to bar a civil fraud recovery from Paltrow or NAC. The government is now pursuing the only potential civil remedy left to it: an equitable claim for unjust enrichment. In other words, this is not a civil action for fraud against Paltrow or NAC, nor is it a criminal prosecution; it is strictly a civil claim for restitution based on the common law equitable theory of unjust enrichment.

I.   Unjust Enrichment.

The Restatement of Restitution provides that, "A person who has been unjustly enriched at the expense of another is required to make restitution." Restatement of Restitution, § 1. Unjust enrichment may exist either where the defendant has retained something to which the plaintiff has a superior right or where the defendant has avoided or shifted to the plaintiff the cost of performing a duty which the defendant was primarily obligated to perform. United States v. P/B Stco 213, 756 F.2d 364, 371 (5th Cir. 1985).

Here, the government's claim against the charities falls into the latter category and is relatively straight-forward.  It asserts that the charities unlawfully obtained the benefit of a reduced-rate mailing permit and, therefore, improperly shifted a substantial portion of the actual cost of delivering their bulk mailings to the government.  Basically, the Postal Service says it was tricked into delivering the charities' mail for half the usual price.  The government seeks the return of that benefit, measured by the value of the postage the charities unlawfully avoided.

II.  Claims Against the Charities.

Paltrow and NAC concede that the charities were not lawfully entitled to obtain or use the reduced-rate mailing permit.  They also seem to concede that the charities were "unjustly enriched" by their use of ACRF's mailing permit.  The government's evidence, however, demonstrated that while the charities were hardly entitled to the benefit of the postage discount and were plainly guilty of fraud, they were not (or, more precisely, they are no longer) unjustly enriched.

The relationship between the government and the charities was basically this: the Postal Service expected the charities to be and to conduct themselves as legitimate charitable organizations, applying the proceeds of their fund-raising efforts to recognized charitable purposes. Consistent with its own policies, and the charities' representations, the Postal Service in turn permitted the charities to mail their solicitations at a discount. The charities were frauds from the outset, but in the end the government obtained that which it rightly expected in exchange for reducing the postage charged to the charities: the charities contributed (albeit at the government's insistence) more than $300,000 to educational research centers, representing basically all of the funds raised, minus amounts expended on actual costs of preparing the solicitations (and the criminal fine). Of course, the charities' coerced philanthropy did not make legal or laudable that which was illegal and contemptible (i.e., their fraudulent acquisition and use of the permit and their fraud on the public). It does, however, undermine the government's equitable claim that the charities remain "unjustly enriched" -- that is, that they retain something of value belonging to the government, or that they inequitably shifted much of the cost of mailing the "charitable"

14

solicitations to the government, without ever fulfilling the obligation to apply the proceeds realized from use of the permit to legitimate charitable purposes.

Due to the government's initial vigilance and swift interdiction, the charities were stopped before they could disburse all of the proceeds of their solicitations to NAC or other creditors. The evidence showed and the court finds that NAC was not paid any sort of premium for the work performed, and in fact the cost of production charged to the charities was below the norm in the industry (NAC actually realized a loss on the business). And, as noted above, the government required the charities to apply all of its remaining funds to legitimate research facilities and to pay a criminal fine. The intended beneficiaries of the government's extension of a reduced postage rate to ACRF (i.e., legitimate charities and research centers) received that which the government intended them to receive. Thus, it is unclear precisely how the charities remain unjustly enriched at the government's expense by their use of the mailing permit.

Suppose, for example, that a parent contracts with and pays an individual to paint her child's house.  If the painter fails to paint the house and retains the monies paid, he is of course unjustly enriched by the amount paid.  If, however, the painter accepts the money, never intending to paint the house, but his scheme is revealed and he is required through criminal prosecution or a civil suit to paint the house, and actually does so, he is no longer unjustly enriched, at least not as of the time he completes the job.  In that case, the parent eventually received the benefit of her bargain: the house was painted and the money served its intended purpose.  Plainly, the parent would have no continuing claim against the painter for <u>unjust enrichment</u> once the required performance was completed.  At that point, after his coerced performance, the painter would retain nothing to which the parent had a superior right (i.e., the payment), nor would he inequitably retain any benefit resulting from his having avoided (or shifted to the parent or child) the burden of performing a duty which he should have performed (i.e., painting the house).  Whether other causes of action might lie is beside the point — an unjust enrichment cause of action would not lie.

16

So it is in this case.  In order to promote certain social goals, the government, through its Postal Service, agrees to provide qualifying entities with discounted mailing rates to facilitate (and subsidize) private efforts to raise funds for charitable causes.  Despite their initial intention not to contribute receipts to legitimate research facilities, the charities in this case were, in the end, forced to do exactly that.  Accordingly, the government's purpose in extending discounted postage rates was substantially fulfilled.  Or, stated somewhat differently, the charities were required to honor their equitable obligations to the government arising from their use of the mailing permit by actually providing the quid pro quo required of all entities granted reduced-rate mailing permits (i.e., application of the proceeds to recognized charitable purposes).[4]

---

[4]  While not critical to this analysis, it is still noteworthy, given the equitable nature of the relief sought, that the Department of Justice has represented varied and successive governmental interests relative to these defendants, and probably should have considered that by requiring a $100,000 civil fine and payment of all remaining assets to legitimate charities in the earlier cases, the Postal Service's right to recover (and ability to recover) might be compromised.  The Postal Service, after all, might have preferred a restitution rather than a "performance" remedy.

17

While evidence of their fraudulent conduct is plain, it is difficult to see how ACRF and AHRF remain "unjustly enriched" by their unlawful use of the permit.  Like the painter in the earlier example, the charities were forced to perform their side of the permit "bargain" with the government.  In any event, the government failed to show by a preponderance of the evidence that the charities remain unjustly enriched, or that under the circumstances an order of restitution ought, in equity, to issue.

III. Claims Against Paltrow.

Although the charities have been defaulted, it was still appropriate to consider whether they in fact remain unjustly enriched because one aspect of the government's unjust enrichment claims against Paltrow and NAC is derivative in nature.  But, even if the government had demonstrated that the charities remain unjustly enriched, there is still insufficient evidence to persuade the court that Paltrow was personally enriched by the charities' conduct.  Accordingly, he is not directly liable for the postage deficiencies.

Paltrow might, however, be indirectly liable to the government for the postage deficiencies on an unjust enrichment

18

theory, if the charities remained unjustly enriched and the government could demonstrate a sound legal and factual basis upon which to pierce the charities' respective corporate veils to impose their unjust enrichment liability upon him as an alter ego.

Although the court has found that the charities do not remain unjustly enriched as a result of their improper use of the mailing permit (thereby rendering it unnecessary to consider piercing the corporate veils), the court will, nevertheless, proceed as if the government had proved its unjust enrichment claims against the charities in order to explain its additional conclusion that Paltrow is not liable on an alter ego theory.

The parties agree (and pertinent caselaw supports) that the court should apply federal common law, rather than state law, in determining whether it is appropriate under the facts of a particular case to pierce the corporate veil. United Elec., Radio and Mach. Workers of America v. 163 Pleasant Street Corp., 960 F.2d 1080, 1091-92 (1st Cir. 1992); see generally, Note, Piercing the Corporate Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L. Rev. 853 (1982). Moreover, this court

19

(Stahl, J.) previously determined that it will, to the extent possible, apply federal law as interpreted by the First Circuit (rather than the Third Circuit, from which a portion of this case was originally transferred).

In this circuit, a party must prove three things before the court may, under federal common law, pierce the corporate veil: (1) lack of corporate independence; (2) fraudulent intent on the part of the corporation's principals; and (3) that a substantial injustice would befall the proponent of piercing the corporate veil if the court were to validate the corporate shield. United Elec. Workers, 960 F.2d at 1093; Alman v. Danin, 801 F.2d 1, 4 (1st Cir. 1986). Accord United Steelworkers of America v. Connors Steel Co., 855 F.2d 1499, 1506-07 (11th Cir. 1988), cert. denied, 489 U.S. 1096 (1989); Seymore v. Hull & Moreland Engineering, 605 F.2d 1105, 1111 (9th Cir. 1979).

A.    Lack of Corporate Independence.

In determining whether there is a lack of corporate independence, courts have focused on a number of factors.

> These factors include, in approximate descending order of importance, (1) inadequate capitalization in light of the purposes for which the corporation was

20

organized, (2) extensive or pervasive control by the shareholder or shareholders, (3) intermingling of the corporation's properties or accounts with those of its owner, (4) failure to observe corporate formalities and separateness, (5) siphoning of funds from the corporation, (6) absence of corporate records, and (7) nonfunctioning officers or directors.

In re Acushnet River & New Bedford Harbor Proceedings, 675 F. Supp. 22, 31 (D. Mass. 1987).

Evidence on this point is, at best, mixed. There was no evidence to suggest that the charities were not properly established (i.e., originally incorporated) as non-profit, charitable corporations. Nor does it appear that they were thinly capitalized in light of the purpose for which they were organized. Importantly, there was no evidence that there was any intermingling of the charities' assets with those of NAC or Paltrow or that NAC or Paltrow siphoned-off funds from the charities. Nor did the government show an absence of corporate records or a pervasive failure to observe corporate formalities or corporate separateness. In most material respects, the charities were operated as corporate entities. They maintained separate bank accounts, produced periodic accounting statements, passed corporate resolutions, etc.

21

The government did demonstrate that the officers and directors of the charities (with the exception of Paltrow) were essentially non-functioning. Evidence of Paltrow's control over the charities was clear and unmistakable. Understandably, therefore, the government rests much of its claim that there was a lack of corporate independence on that fact.

On balance, after considering the evidence relating to each of the factors listed above and ascribing to it the relative weight suggested in Acushnet River, the court is not persuaded that the government has met its burden. In short, the government succeeded in demonstrating only that: (i) Paltrow exercised significant control over the charities' affairs (hardly a unique circumstance in small, closely held corporations); and (ii) the directors and other officers were essentially nonfunctioning. Without more, the court is constrained to hold that the government has failed to produce sufficient evidence in support of the first element of the three-part test articulated in United Elec. Workers. As the Court of Appeals for the Fourth Circuit has observed, "The conclusion to disregard the corporate entity may not . . . rest on a single factor, whether under-capitalization, disregard of the corporation's formalities, or

what-not, but must involve a number of such factors." <u>DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.</u>, 540 F.2d 681, 687 (4th Cir. 1976). Viewed in its entirety, the government's evidence on that point simply falls short. Paltrow would, of course, be personally liable for the corporations' fraud, as he conceived and directed it, but corporate fraud (or controlling officer-directed corporate fraud), is not, alone, enough to disregard the corporate form.

B.   <u>Equitable Considerations and "Manifest Injustice."</u>

Turning to the equities, it is evident that the government is now without an adequate remedy at law by which to pursue Paltrow, NAC, or the charities for the postage deficiency. An equitable claim for unjust enrichment is apparently the only means not time-barred by which the government might recover from the charities and, more importantly, Paltrow or NAC (because the charities have been rendered insolvent and defunct). Normally, the lack of an adequate remedy at law is a factor which weighs in favor of affording equitable relief. <u>See, e.g.</u>, <u>Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.</u>, 14 F.3d 1507, 1518 (11th Cir. 1994) ("It is axiomatic that equitable relief is only

23

available where there is no adequate remedy at law."), <u>cert. denied</u>, 115 S.Ct. 1092 (1995).

Here, however, the government is without an adequate remedy at law because it neglected to sue Paltrow or NAC for civil fraud within the time allowed by the pertinent statute of limitations. For whatever reason, the government also seems to have agreed not to indict Paltrow or NAC for their role in the fraud, thereby forfeiting any hope of obtaining a criminal order of restitution against either of them. <u>See</u> Government's Exhibit 22, para. 3a. The government's predicament appears to be largely one of its own making yet, because of the unavailability of an adequate remedy at law, it now seeks to strain principles of corporate law and equity in order to obtain the relief it could have easily obtained had it simply pursued its legitimate fraud claims in a reasonable and timely manner. Having created the very predicament in which it now finds itself (inadequate remedy at law), it cannot complain if equity looks upon its unjust enrichment claim with disfavor. <u>See</u> <u>Norris v. Grosvenor Marketing Ltd.</u>, 803 F.2d 1281, 1287 (2d Cir. 1986) ("An equitable claim [for unjust enrichment] cannot proceed where the plaintiff has had and let pass an adequate alternative remedy at law.").

Moreover, the mere fact that the charities are insolvent (because the government quite properly exacted a substantial fine, forced the distribution of their remaining assets to legitimate charities, and required them to dissolve) is not, standing alone, a sufficient basis to pierce the corporate veil and hold Paltrow personally liable for corporate obligations as an alter ego. The inability to discharge financial obligations exists in almost all cases in which a party seeks to disregard the corporate form. Ordinarily, that fact alone is not sufficient to establish the element of injustice necessary to hold a corporation's principals or shareholders liable for its debts. Kansas City Roofing, 2 F.3d at 1053 (citing cases); Sea-Land Services, Inc. v. Pepper Source, 941 F.2d 519, 524 (7th Cir. 1991).

On balance, the equities of this case are insufficient to justify disregarding the charities' corporate form to hold Paltrow liable for their wrongs, given that Paltrow could have been easily held liable if the adequate available remedy had been pursued. While Paltrow engaged in shameful, fraudulent, and criminal conduct, and is hardly a sympathetic figure, still, the government had every opportunity to pursue him (and NAC), but

25

failed to act. For that reason, even if the government had proved that the charities remain unjustly enriched and Paltrow was the alter ego of the charities, the court would still, in the exercise of its discretion, decline to award the government the equitable remedy it seeks because, in light of all the facts underlying this case, the court is not persuaded that "a substantial injustice would be visited on the proponents of veil piercing should the court validate the corporate shield." United Elec. Workers, 960 F.2d at 1093. The government would not suffer any substantial injustice because the government has already exacted a full equitable measure of recovery in this matter -- the substantial fine, and payment of all remaining proceeds to legitimate charities -- or at least a recovery roughly sufficient to balance the scales relative to its "unjust enrichment" claim.

While it might well have been appropriate for the government to recover damages for civil fraud (in addition to the penalties imposed on and recoveries obtained from the charities) and to prosecute and, if convicted, punish Paltrow and NAC for their respective roles in the charities' fraudulent scheme, to include perhaps incarceration and separate fines, the government declined to do so. Equity should not now be invoked to distort common law

26

forms or corporate law simply to rescue the government from a self-made predicament.

The inquiry is, therefore, at an end. The government failed to demonstrate that the charities remain unjustly enriched, and, having failed to carry its burden with regard to both the first and third essential elements of the three-part test set forth in United Elec. Workers, the government's effort to pierce the charities' corporate veils would necessarily fail as well, even if the charities had been shown to be unjustly enriched.[5] Judgment shall be entered in favor of Paltrow.

IV. Claims Against NAC.

The government also claims that the court should hold NAC liable for the postage deficiencies on a theory of unjust enrichment. In support of that assertion, the government makes the following argument.

> Paltrow admitted in open court that the "charities"
> were frauds, " . . . created principally to generate
> profits and business for North American

---

[5] Because the government established neither the first nor the third essential element of the "veil piercing" test established in United Elec. Workers, the court need not address the third element of fraud. Id., at 1093 n. 13.

27

> Communications." Furthermore, Paltrow concedes that he determined that NAC would finance the mailings on behalf of the organizations, which, in turn, would reimburse NAC through future donations.
>
> ACRF's reduced rate permit, which both ACRF and AHRF used, was tantamount to NAC receiving a reduced rate permit: the less the organizations were charged for postage, the less NAC expended for the postage on their behalf. The portion, if any, that NAC was reimbursed by the organizations is irrelevant: <u>the bottom line is that NAC should have paid the additional postage and benefited unjustly by failing to do so</u>.

Government's Trial Brief at 10 (emphasis added). While the government's argument has a certain appeal, the court remains unpersuaded.

In order to prevail on its claim of unjust enrichment, the government must first prove that NAC was enriched at the government's expense and that it would be unjust for NAC to retain whatever benefit it received. <u>Cheshire Medical Center v. W.R. Grace & Co.</u>, 764 F. Supp. 213, 218 (D.N.H. 1991), <u>vacated in part on other grounds</u>, 767 F. Supp. 396 (D.N.H. 1991). For the reasons discussed earlier, the evidence presented at trial fails to support the claim that NAC was (or remains) unjustly enriched at the government's expense by the charities' conduct.

28

Contrary to the government's argument, NAC was not legally obligated to pay the postage associated with the mailings. NAC agreed as part of the scheme to advance the funds necessary to make the mailings, with the understanding that it would be reimbursed by the charities from amounts collected. NAC knew the charities were frauds and that the permit was being abused, and it probably benefitted from that abuse to the same extent as the charities. But, even if NAC had some joint, or derivative, duty to pay the full postage on the charities' behalf, at this point NAC, like the charities, holds nothing to which the government has a superior claim, nor does it continue to realize any benefit from the government's extension of postage discounts to the charities. NAC's "unjust enrichment," if any, is necessarily derivative of the charities' alleged unjust enrichment, and, on the same grounds discussed previously, NAC is found not to be (or remain) unjustly enriched. NAC, like Paltrow, may well have been liable criminally or civilly for fraud, but the government has not pursued those claims.

Finally, the same equitable considerations which weigh against awarding the government relief against Paltrow (e.g., failure to indict, failure to seek a criminal order of

29

restitution, failure to pursue a timely civil action for fraud, specific performance by the charities, etc.) weigh against affording the government equitable relief against NAC.

## Conclusion

For the reasons discussed, defendants NAC and Robert Paltrow are not liable on the government's common law unjust enrichment claim. To be sure, this is an unsettling case. Paltrow and the charities conducted themselves in a shameful and deceitful manner, preying upon the kindness and generosity of the public. But, our legal system provides several remedies for such behavior. The government pursued some of those remedies, elected not to pursue others, and failed to pursue others in a timely fashion. The government chose not to indict Paltrow and NAC for their roles in the criminal conduct of ACRF and AHRF, and did not bring timely civil actions against either of them for fraud. Rather than seek a criminal order of restitution from the charities for the unpaid postage, the government instead required the charities, in the preceding criminal and civil cases, to pay a substantial fine and contribute their remaining assets to bona fide charitable organizations, thereby obtaining a full equitable remedy and undermining its current claim for reimbursement on

30

behalf of the Postal Service.  Having earlier elected a performance remedy (i.e., requiring ACRF and AHRF to behave like the bona fide charities they fraudulently pretended to be), the government cannot now equitably claim that the charities remain <u>unjustly</u> <u>enriched</u> by their use of the bulk mailing rate available to legitimate charitable organizations.  The government cannot, in equity, obtain both performance and restitution; because it previously chose and obtained performance, restitution is no longer available.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.  <u>Kelly v. Everglades Drainage Dist.</u>, 319 U.S. 415, 422 (1943); <u>Applewood Landscape & Nursery Co. v. Hollingsworth</u>, 884 F.2d 1502, 1503 (1st Cir. 1989); <u>Morgan v. Kerrigan</u>, 509 F.2d 580, 588 n.14 (1st Cir. 1974), <u>cert. denied</u>, 421 U.S. 963 (1975).  Any requests for findings of fact or rulings of law not expressly or implicitly granted in the body of this opinion are hereby denied.

The Clerk of the court is instructed to enter judgment in favor of the defendants, North American Communications, Inc. and

Robert Paltrow.  Judgment by default shall be entered against ACRF and AHRF, but because the court has determined that they do not remain unjustly enriched and restitution is not available in equity under the facts of this case, no damages are awarded (nor, of course, would damages be collectible as the government must concede that ACRF and AHRF are defunct and without assets). Fed. R. Civ. P. 55.


      SO ORDERED.


_____
Steven J. McAuliffe
United States District Judge

June 13, 1996

cc:  Kenneth I. Schacter, Esq.
     David W. Jordan, Esq.
     Patrick M. Walsh, Esq.
     Robert Kirsch, Esq.